## ARGUED AND DETERMINED

IN THE

# SUPREME COURT OF TENNESSEE

FOR THE

## MIDDLE DIVISION

NASHVILLE, DECEMER TERM, 1917.

Nashville, C. & St. L. Ry. *v.* Kallock.*

(*Nashville.* December Term, 1917.)

1. **MASTER AND SERVANT.** Injury from defective tool. Negligent furnishing. ''Burred.''

Punch, the head of which was "burred," or mashed down, by the blows of a heavy hammer and parts of it flattened over on the stem, whereby boiler maker's assistant was injured, *held* not furnised by master, so as to render it liable; he borrowing it of another workman, on suggestion or direction of another than his department foreman, who alone, under master's rules, could direct this. (*Post, pp.* 392-396.)

2. **MASTER AND SERVANT.** Injury to employee. Vice principal.

Boiler maker, though leader in the particular work to which he and his assistant were assigned by subforeman, was not a vice principal, but only fellow servant of his assistant, injured in the work. (*Post, pp.* 396-398.)

Case cited and approved: Southern Ry. Co. v. Hensley, 138 Tenn., 408.

---

*On liability of master for injuries caused by splinters flying from hammers or chisels, punches, and other similar tools, see notes in 13 L. R. A. (N. S.) 668, 30 L. R. A. (N. S.) 800, 40 L. R. A. (N. S.) 832. 51 L. R. A. (N. S.) 337.

391

FROM DAVIDSON.

Appeal from the Circuit Court of Davidson County to the Court of Civil Appeals, and by *certiorari* to the Court of Civil Appeals from the Supreme Court. —Hon. Thos. E. Matthews, Judge.

Claude Waller, Fitzgerald Hall and Frank Slemons, for plaintiff in error.

Wm. A. Guild and McCarley & Stephenson, for defendant in error.

Mr. Chief Justice Neil delivered the opinion of the Court.

After a careful reading of the record, the opinion of the court of civil appeals, the petition for the writ of *certiorari*, and the briefs of counsel, and after hearing the oral argument of counsel, and fully considering the case, we are of the opinion that the court of civil appeals reached the correct conclusion, and that the judgment of that court, dismissing the action, should be affirmed.

The defendant in error was a boiler maker, engaged in the service of the plaintiff in error. He had been so engaged about six years. He was known as a "handy man." The service that he preformed was to use the hammer while an older boiler maker,

and one more experienced, held the punch. On the day he was injured he was working as a helper to E. W. Armstrong. The latter held what is known as a "backing-out punch" against a rivet that was about to be driven from a locomotive tank under repair. The defendant in error, after striking two or three light blows, then struck a sharp blow on the head of the punch, and a sliver flew from the punch, or from the hammer, entered one eye, and destroyed the sight of it. The evidence does not indicate from what source the sliver came. The jury necessarily found that it came from the punch, or they could not have found a verdict in favor of the plaintiff in error, since the punch was charged in the declaration as being the source of the sliver. Defendant in error says that the sliver came from the head of the punch or "flew off some way." That is as near as the evidence comes to establishing the source of the sliver. But we do not base our decision on this point. We shall assume that the sliver came from the head of the punch. The decisive question, as we think, is whether the plaintiff in error was guilty of any negligence in the matter of furnishing the punch.

The evidence upon this point is that under the rules of the company each workman was given ten metal checks with his number on them. When he needed any tool, he was required to present one of these checks at the tool room, or shop, and the tool, if on hand, would be handed to him in exchange for the check, which would be kept until the return of

the tool. No workman could get a tool out of the shop on the check of another, but only on his own check. He was expected to return the tool to the shop when it became impaired by use, and have it restored to proper condition. The purpose of the rule was to enable the company to keep a line on the tools and to keep them in proper condition. Every workman, however, was permitted to make such repairs on the tools as could be effected by grinding on an emery wheel, if he chose to do so. This was done, in respect of the punches, mainly when they became burred by use. By "burring" it is to be understood that the head of the punch is mashed down by the blows of a heavy hammer, and parts of it flattened over on the stem. These may be ground off by the workman himself, or he may return it to the shop for this repair, as well as any other. Under the rule, in case a check is presented and a tool required by the workman which cannot be furnished at the time by the shop, the workman must apply to the foreman of his department for instructions. The foreman can give him a requisition on the foreman of the blacksmith shop for the making of the tool required, or he could direct the workman applying to ask some other workman for the loan of such tool, if not in use by the latter. On the day on which the injury occurred, defendant in error and Armstrong were directed by a subforeman of the department to repair the locomotive tank referred to. Defendant in error was directed to act as helper to Armstrong on the job.

This was about 4:30 o'clock in the afternoon of a winter's day. The closing time was 5:30. Before the job could be begun it was necessary to have a 3-8-inch punch, called a "backing-out punch," to be used for the purpose of expelling the old rivets from the tank at the place at which it was to be patched. The heads of the rivets had already been knocked off, and it remained simply to drive them out with the backing-out punch. It was therefore necessary to have a backing-out punch. Armstrong directed defendant in error to go and get such punch. He went to the tool room, or shop, and called for the required punch. He was informed that there was no punch of that description in the shop. He then went, according to the rules, to see the foreman of his department. The foreman gave him a requisition on the foreman of the blacksmith shop for the required tool. The foreman of the blacksmith shop informed him that he would have the tool ready for him early the next day, and suggested that he borrow a tool from some one else. Defendant in error went back and reported the result to Armstrong. The latter then told him to go and borrow a tool from Sim Kizer, another boiler maker in a part of the shops some two hundred and fifty yards away. He thereupon proceeded to the place where Kizer was working and asked him to lend Armstrong a 3-8-inch backing-out punch. Kizer told him he had only one, and that that was broken, having a piece chipped off of the point, and suggested that he take it and grind it to a round point. De-

fendant in error said that he did not know whether
he had time, but he took it back to Armstrong, and
the latter, on looking at it, said that he thought it
would do, and began to work, with the result already
stated.

It is insisted by defendant in error that the head
of this punch was too hard, and was therefore likely
to chip off when struck with a heavy hammer.  There
is an expert, the witness Lawrence, who testified
that the tool, when exhibited to him on the trial,
showed some circular chips from the outside of the
stem, and he judged from this that the outside of
the stem or upper end of the tool was heated hotter
than the inside of it, with the result that when the
tool was immersed in water, or the bath, as it is
called, for the purpose of tempering, it was unevenly
tempered; that is, the inside was softer than the
outside, or the outside harder than the inside—the
outside being too hard to make it a safe tool.  How-
ever, it appears that the top of the tool was burred
or flattened over, as occurs in tools properly soft,
and the witness Kizer testifies that it had, on the
trial, about the appearance it presented when he
turned it over to defendant in error.  It also appears
in the evidence without contradiction that, even when
properly tempered, the punch will sometimes emit
slivers when struck with a hammer, though, of course,
less frequently than when improperly tempered.  So
that it seems an undisputed fact that it is impossible
to wholly guard against the flying of slivers.

But let it be assumed that the punch in question was improperly tempered, and that the silver flew from its head. The question then to be determined is whether it was furnished to the defendant in error by the plaintiff in error. It certainly was not furnished to him according to the rule of the company. Acting under that rule he had called upon the foreman, and the latter had given him a requisition on the foreman of the blacksmith shop for the making of a new tool early the next day, and it was then within an hour of quitting time. He was not directed by the foreman to borrow from any other workman. It does not appear that the foreman of the blacksmith shop, who suggested that he should borrow from some one else, had any authority to give an order on that subject. Nor does it appear that the boiler maker, Armstrong, for whom he was acting as helper, had any authority to direct such matter. Armstrong had no authority to furnish tools to the defendant in error, or to provide tools for the use of the men. Therefore, when the defendant in error procured the tool from Kizer, on the suggestion or direction of Armstrong, it was not a tool which was furnished to him by the company, the plaintiff in error, and the company was not responsible for the condition of that tool. Kizer and Armstrong, therefore, both took the risk of using the tool.

It is insisted, however, that Armstrong stood to defendant in error in the relation of a vice principal. This is sought to be based upon evidence to the effect that in helping Armstrong he was to act under his

directions. As defendant in error says, if he was directed to strike, he must strike, or if he was directed to hold the punch, he would have to do that; that, if he did not do so, he could be reported to the office. This means nothing more than that Armstrong was the leader in the particular work to which they both had been assigned by the subforeman. Such a leader, in working out the details of the job, is not a vice principal, but only a fellow servant. *Southern Railway Co.* v. *Hensley,* 138 Tenn., 408, 413, 414, 198 S. W., 252.

On the grounds stated, the judgment of the court of civil appeals will be affirmed, with costs.